# UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

-----------------------------------------------------------------------x

In re:                                                    :        Chapter 11

APPLIANCE CONTROLS GROUP HOLDINGS, INC.   :        Case No. 04-14517
APPLIANCE CONTROLS GROUP, INC.,                           (Jointly Administered)

                                                          :
                       Debtors.                                    Hon. A. Benjamin Goldgar


-----------------------------------------------------------------------x

## AMENDED ORDER UNDER 11 U.S.C. §§ 105, 363, 365 AND 1146(c) AND FED. R. BANKR. P. 6004 AND 6006 (A) APPROVING AGREEMENT OF PURCHASE AND SALE WITH PURCHASER, (B) AUTHORIZING SALE OF ASSETS AND ASSUMPTION AND ASSIGNMENT OF ASSUMED EXECUTORY CONTRACTS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS, AND (C) GRANTING RELATED RELIEF

This matter having come before the Court upon the Motion to Authorize Sale of Assets

Pursuant to Section 363 of the Bankruptcy Code of the above-captioned Debtors in these jointly

administered Chapter 11 cases (together, the "Debtor"), dated June 21, 2004 (the "Motion"), for an

Order under sections 105, 363, 365 and 1146(c) of title 11 of the United States Code, 11 U.S.C. §§

101 et seq. (the "Bankruptcy Code"), and Rule 6004 and 6006 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules") (i) approving the Asset Purchase Agreement dated as of July

19, 2004 (as amended from time to time, the "Sale Agreement")[1] for the sale (the "Asset Sale") of

certain real property, appurtenances, and improvements (if any) and personal property and

contracts (as more particularly described in the Sale Agreement, the "Assets") of the Debtor to

---

[1]    Unless otherwise defined, capitalized terms used herein shall have the meanings ascribed to them in the Motion or the Sale Agreement. In the event of any conflict in the meanings of defined terms, the definitions contained in the Sale Agreement shall control.



EXHIBIT

tables*

3

Burner Systems International, Inc., or its designee (the "Purchaser"); (ii) authorizing the sale of the Assets free and clear of all liens, claims, encumbrances and interests; by separate motion or motions filed by the Debtor, authorizing the assumption and assignment of certain executory contracts and unexpired leases (collectively, the "Contracts"); granting related relief; and a hearing having been held on July 19, 2004 (the "Sale Hearing"), at which time all interested parties were offered an opportunity to be heard with respect to the Asset Sale and the identification of the Purchaser; and the Court having considered (i) the Motion, (ii) any competing bids and objections to the Motion, and (iii) the arguments of counsel made, and the evidence proffered or adduced, at the Sale Hearing; and it appearing that the relief requested in the Motion is in the best interests of the Debtor, its estate, its creditors and other parties in interest, is not opposed by the Official Committee of Unsecured Creditors of the Debtors (the "Creditors' Committee") and is approved under section 363(f) of the Bankruptcy Code by Hilco Capital, L.P. and Fortress Credit Corp., the secured lenders to the Debtor (the "Secured Lenders"); and any and all objections having been resolved or overruled by the Court and upon the record of the Sale Hearing; and after due deliberation thereon and good cause appearing therefor:

IT IS HEREBY FOUND AND DETERMINED THAT:[2]

A.    The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A). Venue of this case and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

---

[2]    Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. See Fed. R. Bankr. P 7052.

B.    The statutory predicates for the relief sought in the Motion are sections 105, 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 6004 and 6006.

C.    As evidenced by the affidavits of service filed with the Court, and based on the representations of counsel at the Sale Hearing, (i) proper, timely, adequate and sufficient notice of the Motion, the Sale Hearing and the Asset Sale has been provided in accordance with sections 102(1), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006, to all creditors and interested parties in the Debtor' above-captioned chapter 11 case, (ii) such notice was good and sufficient and appropriate under the particular circumstances, and (iii) no other or further notice of the Asset Sale, the Motion, or the Sale Hearing is required.

D.    A reasonable opportunity to object or be heard with respect to the Motion and the relief requested therein has been afforded to all interested persons and entities, including (i) the Office of the United States Trustee for the Northern District of Illinois; (ii) counsel for the Purchaser; (iii) counsel for the Secured Lenders; (iv) all entities known to have expressed an interest in a transaction with respect to the Assets during the six (6) months prior to the date of the Motion; (v) all entities known to have an Interest (as defined below) in the Assets; (vi) all federal, state, and local regulatory or taxing authorities or recording offices which have a known interest in the relief requested by the Motion; (vii) all parties to the Contracts; (viii) the United States Attorney's office; (ix) the Internal Revenue Service; (x) the Environmental Protection Agency; (xi) all creditors and other parties in interest; and

(xii) all other entities that have filed requests for notices in the Debtor's chapter 11 cases pursuant to Bankruptcy Rule 2002.

E.     The Debtor has full power and authority to consummate the transactions contemplated by the Sale Agreement. No consents or approvals, other than those expressly provided for in the Sale Agreement, are required for the Debtor to consummate such transactions.

F.     Approval of the Sale Agreement and consummation of the transactions contemplated therein (the "Transactions") at this time are in the best interests of the Debtor's estate and their respective creditors.

G.     The Debtor has demonstrated (i) a good, sufficient, and sound business purpose and justification and (ii) compelling circumstances for the Transactions pursuant to section 363(b) of the Bankruptcy Code.

H.     The Sale Agreement was negotiated, proposed and entered into by and between the Purchaser and the Debtor at arms' length, without collusion and in good faith, and with the approval of the Secured Lenders. The Purchaser is a good faith purchaser under section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby. Neither the Purchaser nor the Debtor have engaged in any conduct that would cause or permit the Sale Agreement to be avoided under section 363(n) of the Bankruptcy Code.

I.     There is no need for a stay of this Order under Bankruptcy Rule 6004(g) as the Purchaser is acting in good faith within the meaning of section 363(m) of the Bankruptcy Code, and there is no need to delay closing the

Transactions contemplated under the Sale Agreement at any time after the entry of this Order.

J.     The Sale Agreement is the highest and best offer for the Assets and will provide a greater recovery for the Debtor's estate than would be provided by any other practical, available alternative.

K.     The consideration provided by the Purchaser for the Assets pursuant to the Sale Agreement constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and applicable non-bankruptcy law.

L.     The transfer of the Assets to the Purchaser pursuant to the Sale Agreement will be a legal, valid, and effective transfer of the Assets, and vests or will vest the Purchaser with all right, title, and interest of the Debtor to the Assets free and clear of

> (i)     any mortgages, security interests, conditional sales or other title retention agreements, pledges, liens, claims, judgments, demands, encumbrances (including, without limitation, claims, and encumbrances (i) that purport to give to any party a right or option to effect any forfeiture, modification or termination of the Debtor's or the Purchaser's interests in the Assets or (ii) in respect of taxes, easements, restrictions, rights of first refusal, charges or interests of any kind or nature, if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership) (collectively, the "Interests"), and

> (ii)    debts arising under, relating to, or in connection with any acts of the Debtor, claims (as that term is defined in section 101(5) of the Bankruptcy Code), obligations, demands, guaranties, options, rights, contractual commitments, restrictions, interests and matters of any kind and nature, whether arising prior to or subsequent to the commencement of this case, and whether imposed by agreement, understanding, law, equity or otherwise (including, without limitation, claims and encumbrances (i) that purport to give to any party a right or option to effect any forfeiture, modification, right of first refusal, or termination of

> any of the Debtor's or the Purchaser's interests in the Assets, or
> any similar rights, or (ii) in respect of taxes) (collectively,
> "Claims").

With the exception of those Claims and Interests expressly assumed in connection with the Sale Agreement (including, without limitation, the Assumed Liabilities), any such non-assumed Claims and Interests to attach to the Debtor's interest in the proceeds of the Asset Sale (the "Sale Proceeds") in order of priority.

     M.     The Debtor may sell the Assets free and clear of all Interests because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied. Those holders of Interests who did not object, or who withdrew their objections, to the Motion are deemed to have consented pursuant to section 363(1)(2) of the Bankruptcy Code. The Secured Lenders have consented to the relief sought. Any holders of Interests that may object are adequately protected by having their Interests, if any, attach to the Sale Proceeds.

     N.     The Debtor has demonstrated that it is an exercise of its sound business judgment to assume and assign the Contracts in connection with the consummation of the Asset Sale, and the assumption and assignment of the Contracts under section 365 of the Bankruptcy Code is in the best interests of the Debtor's estate and its creditors.

     O.     The Debtor and the Purchaser have (i) provided adequate assurance of cure of any default existing prior to the date hereof under any of the Contracts within the meaning of section 365(b)(1)(A) of the Bankruptcy Code, and (ii) provided compensation or adequate assurance of compensation to any party to such contracts or leases for any actual pecuniary loss to such party resulting from a

default prior to the date hereof under any of the Contracts, within the meaning of
section 365(b)(1)(B) of the Bankruptcy Code (the "Cure Amounts").

P. As is more fully set forth in the Sale Agreement, the sale to the
Purchaser of the Assets is conditioned upon the Seller's filing and prosecuting
diligently a motion or motions with the Court for the assignment and assumption of
the Contracts effective upon the Closing of the sale to Purchaser.

Q. On or before the Closing, (i) the Purchaser will pay all Cure Amounts
not in excess of $132,000, and (ii) the Debtor will pay all Cure Amounts in excess of
$132,000.

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED,
AND DECREED THAT:

## General Provisions

1. The Motion be, and hereby is, GRANTED.

2. All objections to the Motion or the relief requested thereby that have not been
withdrawn, waived, or settled, and all reservations of rights included therein, are overruled on the
merits.

## Approval of Sale Agreement

3. The Sale Agreement (including all of the related documents, exhibits, schedules,
lists and agreements) and the transactions contemplated thereby be, and hereby are, approved in
all respects.

4. Pursuant to section 363(b) of the Bankruptcy Code, the Debtor is authorized and
directed to execute, deliver and consummate the Asset Sale, pursuant to and in accordance with

the terms and conditions of the Sale Agreement and the instruments and agreements contemplated thereby.

5. The Debtor is empowered to perform under, consummate and implement, the Sale Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Sale Agreement, and to take all further actions as may reasonably be requested by the Purchaser for the purpose of assigning, transferring, granting, conveying and conferring to the Purchaser, or reducing to possession, the Assets, or as may be necessary or appropriate, to the performance of the obligations as contemplated by the Sale Agreement.

## Transfer of Assets

6. Pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, the Assets shall be transferred to the Purchaser upon consummation of the Sale Agreement, and such transfer shall be, free and clear of (a) all Interests, and (b) all Claims, with the exception of those Claims and Interests expressly assumed in connection with the Sale Agreement (including, without limitation, the Assumed Liabilities), with all such non-assumed Interests and Claims to attach to the Debtor's interest in the Sale Proceeds in the order of their priority, with the same validity, force and effect which they now have as against the Assets, subject to any claims and defenses the Debtor may possess with respect thereto.

7. Except as expressly permitted by the Sale Agreement, all persons and entities holding Interests or Claims of any kind and nature with respect to the Assets, and their successors or assigns, are hereby enjoined from asserting, prosecuting or otherwise pursuing such Interests and Claims of any kind and nature against the Purchaser, its successors or assigns, or the Assets.

8.      The Secured Lenders and their successors or assigns are deemed to consent to the Sale Agreement pursuant to section 363(f) of the Bankruptcy Code and all of their Claims and Interests shall attach to the Sale Proceeds at Closing.

9.      Purchaser is not a successor to Debtor or the Business and shall not incur any liability as such successor, nor shall Purchaser otherwise be liable for any of the non-assumed Interests and Claims, and each holder of any of the non-assumed Interests and Claims is hereby permanently enjoined from commencing, continuing or otherwise pursuing or enforcing any remedy or claim, cause of action or encumbrance against Purchaser related thereto.

## Assumption and Assignment to Purchaser of Assumed Contracts and Assumed Leases

10.     Pursuant to sections 105(a) and 365 of the Bankruptcy Code, and subject to and conditioned upon the closing of the Asset Sale, the Debtor's assumption and assignment to the Purchaser of the Contracts is hereby approved, and the requirements of section 365(b)(1) of the Bankruptcy Code with respect thereto are hereby deemed satisfied.

11.     The Debtor is hereby authorized and directed in accordance with sections 105(a) and 365 of the Bankruptcy Code, to (a) assume and assign to the Purchaser or its designee(s), effective upon the Closing of the Asset Sale, the Contracts free and clear of all Claims and Interests, except those Claims and Interests expressly assumed pursuant to the Sale Agreement (including, without limitation, the Assumed Liabilities); (b) execute and deliver to the Purchaser such documents or other instruments as may be necessary to assign and transfer the Contracts to the Purchaser; and (c) make immaterial modifications to the Sale Agreement prior to the Closing of the Asset Sale.

12.     The Contracts shall be transferred to, and remain in full force and effect for the benefit of, the Purchaser in accordance with their respective terms, notwithstanding any

381834/E/3

9

provision in any such Contract (including those described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer and, pursuant to section 365(k) of the Bankruptcy Code, the Debtor and its estate shall be relieved from any further liability for any breach of such Contracts occurring after such assumption and assignment. The Purchaser shall enjoy all of the rights and benefits under each such Contract without the necessity of obtaining each respective non-Debtor party's written consent to the Debtor's assumption and assignment thereof.

13.     The Cure Amounts shall be paid to the counterparties to the Contracts as a condition to assumption and assignment thereof pursuant to Bankruptcy Code § 365, as set forth in Exhibit A, which payments shall be in full and final satisfaction of all obligations and as full compensation to the counterparties for any pecuniary losses under such Contracts pursuant to Bankruptcy Code § 365(b)(1). Purchaser shall pay all Cure Amounts not in excess of $132,000, and the Debtor is hereby ordered to pay all Cure Amounts in excess of $132,000. The distribution of the Cure Amounts to the counterparties shall be made as soon as practicable; provided, however, that if there is a dispute concerning any proposed Cure Amounts, payment shall be made to the respective contract or lease counterparty only after resolution of such dispute, by this Court or otherwise.

14.     Each non-Debtor party to a Contract hereby is forever barred, estopped, and permanently enjoined from asserting against the Purchaser, or its property, any default or breach under any Contract, any claim of lack of consent or any other condition to assignment thereof, or any counterclaim, defense, setoff, right of recoupment or any other claim asserted or assertable against the Debtor, arising under or related to the Contracts and existing as of the Closing Date or arising by reason of the Asset Sale.

381834/E/3

10

## Additional Provisions

15.     The consideration provided by the Purchaser for the Assets under the Sale
Agreement shall be deemed to constitute reasonably equivalent value and fair consideration
under the Bankruptcy Code and under the laws of the United States, any state, territory,
possession, or the District of Columbia.

16.     The consideration provided by the Purchaser for the Assets under the Sale
Agreement is fair and reasonable and may not be avoided under section 363(n) of the
Bankruptcy Code.

17.     On the Closing Date, this Order will be construed and shall constitute for any and
all purposes a full and complete general assignment, conveyance and transfer of the Assets or a
bill of sale transferring good and marketable title in such Assets to the Purchaser. Each and every
federal, state, and local governmental agency or department is hereby directed to accept any and
all documents and instruments necessary and appropriate to consummate the transactions
contemplated by the Sale Agreement.

18.     On the Closing Date, each of the Debtor's creditors is authorized and directed to
execute such documents and take all other actions as may be necessary to release its Interests in
or Claims against the Assets, if any, as may have been recorded or may otherwise exist.

19.     Any amounts payable by the Debtor to the Purchaser pursuant to the Sale
Agreement or any transactions contemplated thereby (including, without limitation, the Escrow
Fund) shall (a) constitute administrative priority expenses of the Debtor's estate pursuant to
sections 503(b) and 507(a)(1) of the Bankruptcy Code and (b) be paid by the Debtor in the time
and manner provided in the Sale Agreement without further order of this Court.

20. This Order (a) is and shall be effective as a determination that, subject to those Claims and Interests expressly assumed in connection with the Sale Agreement (including, without limitation, the Assumed Liabilities), on the Closing Date, all Interests and Claims of any kind or nature whatsoever existing as to the Debtor or the Property prior to the Closing Date have been unconditionally released, discharged and terminated, and that the conveyances described herein have been effected, and (b) shall be binding upon and shall govern the acts of all entities, including without limitation all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Assets.

21. Any provision limiting the assignment of any Contract shall be null, void and of no force and effect in connection with the assignment to the Purchaser.

22. If any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens*, registrations or other documents or agreements evidencing Claims against or Interests in the Assets shall not have delivered to the Debtor prior to the Closing Date, in proper form for filing or registration and executed by the appropriate parties, termination statements, instruments of satisfaction, and/or releases of all Claims or Interests which such person or entity has with respect to the Assets, each of the Debtor and the Purchaser is hereby authorized and directed to execute and file or register such statements, instruments, releases, registrations and other documents on behalf of the person or entity with respect to the Assets.

23.     All entities who are presently, or on the Closing Date may be, in possession of some or all of the Assets are hereby directed to surrender possession of the Assets to the Purchaser on the Closing Date.

24.     Any depository institution maintaining the Bank Account is hereby directed to transfer all cash in such account to the Purchaser on a daily basis as Purchaser directs. The term "Bank Account" as used herein shall have the same meaning as ascribed to that term in Article II, Section 2.1 of the Sale Agreement, and is defined therein as the bank account listed on Schedule 2.1(n) to the Sale Agreement but excluding any cash held therein prior to the Closing Date.

25.     The Purchaser shall have no liability or responsibility for any liability or other obligation of the Debtor arising under or related to the Assets other than for the Purchase Price and the Assumed Liabilities.

26.     Other than the Assumed Liabilities, the sale, transfer, assignment and delivery of the Assets shall not be subject to any Interests or Claims, and Interests or Claims of any kind or nature whatsoever shall remain with, and continue to be obligations of, the Debtor. All persons holding Interests in or Claims against the Debtor or the Assets of any kind or nature whatsoever (other than persons holding Assumed Liabilities) shall be, and hereby are, forever barred, estopped, and permanently enjoined from asserting, prosecuting, or otherwise pursuing such Interests or Claims of any kind or nature whatsoever against the Purchaser, its property, its successors and assigns, its affiliates or the Assets, with respect to any Interest or Claims of any kind or nature whatsoever such person or entity had, has, or may have against or in the Debtor, its estate, or the Assets. Following the Closing Date, no holder of an Interest in or Claim (other than holders of Assumed Liabilities) against the Debtor shall interfere with the Purchaser's title to or

13

use and enjoyment of the Assets based on or related to such Interests or Claims and all such Claims and Interests, if any, shall be and hereby are channeled, transferred and attached solely and exclusively to the Sale Proceeds. All persons who hold any interests in the Debtor are forever barred, estopped and permanently enjoined from asserting or prosecuting any claims or causes of action against the Debtor or its affiliates, or any of their respective officers, directors, employees, attorneys or advisors, arising out of or in connection with the Asset Sale.

27.    Nothing contained in any Chapter 11 plan confirmed in these cases or the order of confirmation confirming any such plan shall conflict with or derogate from the provisions of the Sale Agreement or the terms of this Order.

28.    Upon the granting of this Order by this Court, with respect to the Sale Agreement, including the assumption and assignment of the Contracts approved and authorized herein or by separate order of the Court, the Purchaser shall be entitled to the protection of section 363(m) of the Bankruptcy Code. The transactions contemplated by the Sale Agreement are undertaken by the Purchaser in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and, accordingly, the reversal or modification on appeal of this Order and the authorization to consummate the transactions provided herein shall not affect the validity of any transfer under the Sale Agreement and this Order to the Purchaser, unless such transfer is duly stayed pending such appeal.

29.    The Purchaser shall be entitled, in its capacity as good faith purchaser, to have representatives, agents, or employees present at the Debtors' business from the date of this Order through the date of Closing to ensure the preservation of all assets subject to the Sale Agreement and otherwise ensure that the Transactions contemplated under the Sale Agreement are fully consummated, and shall not by virtue of such presence be deemed to have acted by or on behalf of

the Debtor or in any other capacity assumed any obligations, duties, liabilities of any kind whatsoever of the Debtor.

30. The terms and provisions of the Sale Agreement and this Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtor, their respective estates, and their respective creditors and interest holders, the Purchaser, and its affiliates, successors and assigns, and any affected third parties including, but not limited to, all persons asserting a Claim against or Interest in the Assets to be sold to the Purchaser pursuant to the Sale Agreement.

31. The failure specifically to include or to reference any particular provision of the Sale Agreement in this Order shall not diminish or impair the effectiveness of such provision.

32. Nothing contained in any order of any type or kind entered in these chapter 11 cases, or any related proceeding, subsequent to entry of this Order, shall conflict with or derogate from the provisions of the terms of this Order.

33. The Sale Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto, in a writing signed by the parties thereto, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement is not material.

34. This Court retains jurisdiction to:

(a) Interpret, implement and enforce the terms and provisions of this Order and the terms of the Sale Agreement, all amendments thereto and any waivers and consents thereunder and of each of the agreements executed in connection therewith;

(b) Compel delivery of the Assets to the Purchaser;

381834/E/3

15

(c)    Resolve any disputes arising under or related to the Asset Sale to the Purchaser, including, without limitation, resolving Cure Amounts owing to counterparties to the Contracts; and

(d)    Adjudicate all issues concerning alleged liens and other Claims and any other alleged Interests in and to the Assets or the Sale Proceeds, including the extent, validity, enforceability, priority and nature of all such alleged liens and other Claims and any other alleged interests relating to the Sale Proceeds.

35.    Notwithstanding Bankruptcy Rules 6004(g), 6006(d) and 7062, this Order shall be effective and enforceable immediately upon entry. The Court expressly finds that there is no reason for delay in the implementation of this Order.

36.    Except as set forth in paragraph 36 hereof, the Purchase Price shall be paid to the Secured Lenders or their designees, for application against the Secured Lenders' claims against the Debtor, pursuant to wire transfer instructions to be provided at the Closing.

37.    For the reasons set forth on the record at the Sale Hearing, the Debtor shall pay, from the proceeds of the Asset Sale, $50,000 to Wolverine Metal Stamping, Inc. ("Wolverine") to resolve any disputes raised in its Limited Objection to the Sale Motion, which amount shall be in full and final satisfaction of any prepetition secured claims which Wolverine could assert against the Debtor or its estate arising prior to the Closing. Notwithstanding anything contained in this paragraph to the contrary, Wolverine may file an unsecured proof of claim against the Debtor in the amount of $108,038.35.

38.    Notwithstanding other provisions in this Order, the Oberlin Filter System (as defined below) shall be transferred and conveyed to Purchaser subject to the GECC Liens (as

defined below) and Purchaser shall assume and be responsible for all outstanding obligations evidenced by the GECC Note and GECC Security Agreement (as defined below) pursuant to a Transfer and Assumption Agreement by and between Purchaser and GECC.

39.     The Assets include a 2003 Oberlin Water Pressure Filter System, mode #OPF-36, serial #091SD (the "Oberlin Filter System"), located at 7463 Bonnyshire Drive Chattanooga, Tennessee. The Oberlin Filter System, together with all additions, attachments, accessories and proceeds, are secured by a valid and perfected first in priority security interest and lien (the "GECC Liens") held by General Electric Capital Corporation ("GECC"). The GECC Liens secure obligations owing from the Debtor as evidenced by (i) a Promissory Note (the "GECC Note") dated October 8, 2003 in the original principal amount of $273,875; and (ii) a Master Security Agreement (the "GECC Security Agreement") dated October 9, 2003.

40.     All of the Debtor's rights (but not their obligations) under the Sale Agreement and the Related Agreements (as defined in the Sale Agreement) are assigned to the Secured Lenders. Accordingly, notwithstanding anything to the contrary contained in the Sale Agreement or Related Agreements, the Secured Lenders may (but shall not be obligated to) exercise the rights and remedies of the Debtor under the Sale Agreement and Related Agreements (whether in its own name or the name of the Debtor) including, without limitation, the right to receive and collect any unpaid Purchase Price and other amounts due to the Debtor under the Sale Agreement and Related Agreement and apply all such amounts on account of any and all obligations due the Secured Lenders by the Debtor in accordance with the terms of (a) that certain Post-Petition Loan and Security Agreement, and (b) that certain Agreed Final Order Authorizing the Debtors to Enter into Postpetition Financing Agreement and Obtain Postpetition Financing Pursuant to I 1 U.S.C. §§ 105, 362 and 364 of the Bankruptcy Code and Granting Liens, Security Interests and

Superpriority Claims (the "DIP Financing Order"). The Secured Lenders shall not have any obligation or liability under the Sale Agreement or Related Agreements by reason of such assignment or exercise of rights, nor shall they be obligated to perform any of the obligations or duties of the Debtor thereunder. In furtherance thereof, Agent (as that term is defined in the DIP Financing Order) and its designees are appointed as Debtor's true and lawful attorney (and agent-in-fact) for the limited purpose of enabling Agent or its agents to assert any claims and demands or enforce any rights and remedies on Debtors' behalf.

Dated:    Chicago, Illinois
          July 23, 2004

ENTERED:

Honorable A. Benjamin Goldgar
United States Bankruptcy Judge

**JUL 2 3 2004**

Page 2 of 14

Case 07-00384    Doc 18-1    Filed 11/14/07    Entered 11/14/07 16:32:50    Desc  Brief
Part 2 In Support of Motion for Summary Judgment    Page 19 of 31

Westlaw.

Slip Copy

Page 1

Slip Copy, 2007 WL 2973829 (N.D.Ill.)
**(Cite as: Slip Copy)**

Grand Pier Center LLC v. ATC Group Services, Inc.
N.D.Ill.,2007.
Only the Westlaw citation is currently available.
    United States District Court,N.D. Illinois,Eastern
                    Division.
    GRAND PIER CENTER LLC, et al., Plaintiffs,
                        v.
ATC GROUP SERVICES, INC., et al., Defendants.
            **Nos. 03 C 7767, 05 C 1156.**

                   Oct. 9, 2007.

Frederick S. Mueller, Daniel Charles Murray,
Garrett L. Boehm, Jr., Johnson & Bell, LTD.,
Chicago, IL, for Plaintiffs.
Michael P. Connelly, Garrett Cleland Carter,
Connelly, Roberts & McGivney, Chicago, IL, for
Defendants.

MARK FILIP, United States District Judge.
**\*1** This case involves an inter-corporate dispute
concerning, *inter alia*, bankruptcy and
environmental issues. Plaintiff, Grand Pier Center
LLC ("Grand Pier" or "Plaintiff"), filed this action
against ATC Group Services, Inc. (also, "ATC").
(D.E. 75-3; D.E. 7 in Case No. 05 C 1156.)This
case has been consolidated with another suit (Case
No. 03 C 7767) that Grand Pier filed against
different defendants who are not parties to this
motion or otherwise discussed in this order.
(D.E.27.) All docket entries hereinafter will refer to
Case No. 03 C 7767.ATC has moved for summary
judgment, a finding of contempt, the imposition of
sanctions, and the award of costs and fees.
(D.E.73.) For the following reasons, ATC's motion
is respectfully denied.

                RELEVANT FACTS

The relevant facts are taken from the parties' Local

Rule 56.1 statements of facts and related exhibits.
Local Rule 56.1 requires that statements of facts
contain allegations of material fact, and those
factual allegations must be supported by admissible
record evidence. See L.R. 56.1; *Malec v. Sanford,*
191 F.R.D. 581, 583-85 (N.D.Ill.2000). In addition,
allegations from Grand Pier's Amended Complaint (
"Complaint") are sometimes included to provide
context, although those assertions are not material
to the disposition of the summary judgment motion.

Grand Pier is suing for losses it suffered from the
failure of a real estate project (at a location known
as the "RV3 Site") which was caused by the
presence of radioactive thorium contamination that
ATC allegedly failed to investigate or disclose.
(D.E. 75-3 ¶ 2; D.E. 113 at 1-2.) Grand Pier
alleges that in September of 1997, ATC issued a
Phase II Subsurface Investigation Report which
evaluated the environmental conditions at the RV3
Site. (D.E. 97 ¶ ¶ 13-14 .) After reviewing the
information ATC had gathered, Grand Pier
purchased the RV3 Site. (*Id.* ¶ 14.)Grand Pier
further alleges that ATC had not in fact investigated
any of the RV3 Site subsurface conditions for
thorium contamination. (*Id.* ¶ 16.)

According to Grand Pier, ATC and its predecessors
performed environmental consulting work at the
RV3 Site between May 1991 and July 1999,
resulting in at least nine separate environmental
reports, none of which made any reference to "ATC
Group Services, Inc." (D.E. 101 ¶ 7 [FN1]; D.E.
97-2 ¶ 5.) Each and every invoice from ATC and
its predecessor for work at the Site referenced only "
ATC Associates, Inc.," as the vendor, and none
made any reference whatsoever to "ATC Group
Services, Inc." (D.E. 101 ¶ 8; D.E. 97-2 ¶ 6.)
Grand Pier states that it had no reason to believe
that ATC Associates, Inc., was related to "ATC
Group Services, Inc.," and that ATC Associates,
Inc., never held itself out as affiliated with "ATC
Group Services, Inc." (D.E. 101 ¶ 9; D.E. 97-2 ¶
7.) The final report submitted by ATC Associates,



EXHIBIT

4

Page 3 of 14

Case 07-00384    Doc 18-1    Filed 11/14/07    Entered 11/14/07 16:32:50    Desc Brief
Part 2 In Support of Motion for Summary Judgment    Page 20 of 31

Slip Copy

Slip Copy, 2007 WL 2973829 (N.D.Ill.)
(Cite as: Slip Copy)

Inc., regarding the subsurface soil conditions at the RV3 Site is a Phase II Environmental Assessment Report dated July 8, 1999. (D.E. 101 ¶ 10; D.E. 97-2 ¶ 8.) Grand Pier's claims are based on alleged misrepresentations and negligence in and concerning these environmental assessments. (D.E. 75-3 ¶¶ 27-44.)

> FN1. Defendant attempts to contest Grand Pier's factual showing on this point, but ATC simply offers an unsworn denial in its Rule 56.1 response. (See D.E. 101 ¶ 7.) This is inadequate under the local rules and well-settled caselaw applying them. *See, e.g., Malec v. Sanford,* 191 F.R.D. 581, 584 (N.D.Ill.2000). Accordingly, for purposes of this opinion, the Court accepts as true Grand Pier's effectively-uncontested factual assertions of this type. *Id.*

**\*2** On July 26, 1999, ATC Group Services, Inc., filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code in the Southern District of New York. (D.E. 97 ¶ 18; D.E. 75-5 at 1.) The bankruptcy petition included " ATC Associates, Inc." as a name "used by the Debtor in the last 6 years."(*Id.*) On the same day, Acquisition Holdings, Inc., ATC New England Corp., Hygenia Laboratories, Inc., ATC InSys Technology, Inc ., ATC Environmental, Inc., ATC Construction Services, Inc., and Bing Yen & Associates, Inc., simultaneously filed voluntary chapter 11 petitions in the Southern District of New York. (D.E. 97 ¶ 19; D.E. 75-5 at 3 (listing affiliated debtors of ATC Group Services, Inc., filing voluntary chapter 11 petitions).) The bankruptcy court entered an order directing the joint administration of the eight pending Chapter 11 cases "solely for procedural purposes." (D.E. 97 ¶ 20; D.E. 75-6.) The joint caption identifies the debtors as "In re ATC Group Services, Inc.," and indicates that the eight cases will be jointly administered, but it makes no mention of "ATC Associates, Inc." (*Id.*)

On July 30, 1999, the bankruptcy court entered an order requiring all persons or entities with claims

arising prior to the petition date of July 26, 1999, to file claims against the appropriate debtors by September 17, 1999. (D.E. 97 ¶ 21; D.E. 75-7 at 2.) The order further required debtors to publish a copy of the Notice of the Bar Date for pre-petition claims, the form of which was approved by the Court, in the national editions of the Wall Street Journal and the New York Times. (D.E. 97 ¶ 22; D.E. 75-7 at 5.) Notice of the Bar Date was published in the New York Times and the Wall Street Journal on August 16, 1999. (D.E. 97 ¶ 23; D.E. 75-8.) On February 14, 2000, the debtors filed their Fourth Amended Joint Consolidated Plan of Reorganization. (D.E. 97 ¶ 24.) On February 15, 2000, the bankruptcy court approved the Debtors' Fourth Amended Disclosure Statement and entered an order requiring notice of the Confirmation Hearing to be published in the national editions of the Wall Street Journal and the New York Times. ( *Id.* ¶ 25.)Notice of the Confirmation Hearing was published in the national editions of the Wall Street Journal and New York Times on February 24, 2000. (*Id.* ¶ 26.)An order was entered by the Bankruptcy Court on March 31, 2000, which confirmed the Debtors' Fourth Amended Joint Consolidated Plan of Reorganization (the "Plan").( *Id.* ¶ 27.)The Plan became effective on April 27, 2000. (*Id.* ¶ 28.)

Paragraph 9.2 of the Plan provides that "[e]xcept as otherwise expressly provided in section 1141 and 1144 of the Bankruptcy Code or the Plan, the distributions made pursuant to and in accordance with the applicable terms and conditions of the Plan are in full and final satisfaction, settlement, release and discharge as against the Debtors of any debt that arose before the Effective Date ...."(*Id.* ¶ 29; D.E. 75-13 ¶ 9.2.) Paragraph 47 of the Order Confirming the Plan states that the payments, distributions, and other treatment afforded under the Plan shall be in full and final satisfaction, settlement, discharge, and release of all claims of any nature whatsoever against the debtors. (*Id.* ¶ 30.)Paragraph 47 further states that all persons shall be precluded from asserting against the Reorganized Debtors, their successors, or assets, any other or further claims based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Confirmation

Case 07-00384   Doc 18-1   Filed 11/14/07   Entered 11/14/07 16:32:50   Desc Brief
Part 2 In Support of Motion for Summary Judgment   Page 21 of 31

Page 4 of 14

Slip Copy, 2007 WL 2973829 (N.D.Ill.)
**(Cite as: Slip Copy)**

Date. (*Id.* ¶ 31.)Paragraph 48 states that all entities that have held, hold or may hold claims against any of the debtors are permanently enjoined from commencing or continuing any action with respect to such claims. (*Id.* ¶ 32.)On June 25, 2004, the Bankruptcy Court entered the final decree closing the Chapter 11 cases of the debtors. (*Id.* ¶ 33 .)All of the actions and inactions alleged in the Complaint were performed by ATC before the effective date of the plan. (*Id.* ¶ 34.)

**\*3** After the initial petition for bankruptcy, all subsequent bankruptcy filings tendered to the bankruptcy court, as well as the notice of the bar date and notice of confirmation date published in the New York Times and the Wall Street Journal, did not name or mention "ATC Associates, Inc" -whether in the caption or the text of such filings or notices. (D.E. 101 ¶¶ 1-3.) According to Grand Pier, it did not receive any actual notice of the bankruptcy proceedings detailed above, and ATC does not claim to have provided any notice except for general publication notice. (D.E. 101 ¶¶ 4-6.) As explained, all of the invoices Grand Pier received from ATC Associates, Inc., for work at the RV3 Site referenced only ATC Associates, Inc., as the vendor, and none made any reference to "ATC Group Services, Inc." (*Id.* ¶¶ 7-9.)Grand Pier states that it first learned of ATC Associates, Inc.'s potential Chapter 11 bankruptcy status from ATC Group Services' in-house counsel, after Grand Pier's present lawsuit had been filed. (D.E. 101 ¶ 13; D.E. 97-2 ¶ 11.)

## LEGAL STANDARD

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."Fed.R.Civ.P. 56(c). The nonmovant cannot rest on the pleadings alone, but must identify specific facts, *see Cornfield v. Consol. High Sch. Dist. No. 230,* 991 F.2d 1316, 1320 (7th Cir.1993), that raise more than a scintilla of evidence to show a genuine triable issue of material fact. *See Murphy v. ITT Educ. Servs., Inc.,*

176 F.3d 934, 936 (7th Cir.1999) (citation omitted). The Court views the properly presented record and all reasonable inferences drawn therefrom in the light most favorable to the nonmovant. *See* Fed.R.Civ.P. 56(c); *Foley v. City of Lafayette,* 359 F.3d 925, 928 (7th Cir.2004).

## DISCUSSION

### I. ATC Has Not Demonstrated that Grand Pier's Claim Was Discharged in the Bankruptcy Proceeding

Grand Pier does not dispute that its claim against ATC Associates, Inc., arose before ATC's petition for bankruptcy. Therefore, Grand Pier is considered a "creditor" for bankruptcy purposes. *See Fogel v. Zell,* 221 F.3d 955, 960 (7th Cir.2000) (collecting authorities).

"Under the Bankruptcy Code, a debtor is generally discharged from any debt [to a creditor] that arose prior to the bankruptcy court's confirmation of the debtor's proposed liquidation or reorganization plan. "*In re J.A. Jones, Inc.,* 492 F.3d 242, 249 (4th Cir.2007) (citing 11 U.S.C. § 1141(d)). However, as *In re Banks,* 229 F.3d 296 (4th Cir.2002), explained, a binding discharge in bankruptcy against a putative suitor necessarily requires that the suitor has been afforded due process in connection with the bar on any claims. Specifically, *In re Banks,* stated:
We agree a bankruptcy court confirmation order generally is afforded a preclusive effect. But we cannot defer to such an order if it would result in a denial of due process in violation of the Fifth Amendment to the United States Constitution. Where the Bankruptcy Code and Bankruptcy Rules specify the notice required prior to the entry of an order, due process generally entitles a party to receive the notice specified before an order binding the party will be afforded preclusive effect.

**\*4** *Id.* at 302 (citing, *inter alia, Mullane v. Central Hanover Bank and Trust,* 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950)); *accord In re Hanson,* 397 F.3d 482, 487 (7th Cir.2005)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 07-00384   Doc 18-1   Filed 11/14/07   Entered 11/14/07 16:32:50   Desc Brief
Part 2 In Support of Motion for Summary Judgment   Page 22 of 31

Page 5 of 14

Slip Copy                                                                                Page 4

Slip Copy, 2007 WL 2973829 (N.D.Ill.)
**(Cite as: Slip Copy)**

(similar); *Chemetron Corp. v. Jones,* 72 F.3d 341, 346 (3rd Cir.1995) ("Inadequate notice is a defect which precludes discharge of a claim in bankruptcy. "); *Reliable Elec. Co. v. Olson Construction Co.,* 726 F.2d 620, 623 (10th Cir.1984) ("[W]e hold that notwithstanding the language of section 1141 [of the Bankruptcy Code, which provides for discharge under a confirmed plan], the discharge of a claim without reasonable notice of the confirmation hearing is violative of the fifth amendment to the United States Constitution.") (collecting Supreme Court and circuit court precedent, including *Mullane, supra,* and *City of New York v. New York, New Haven & Hartford R.R. Co.,* 344 U.S. 293,297(1953)).[FN2]

> FN2.*See also, e.g., Solow Building Co., LLC v. ATC Associates, Inc.,* 175 F.Supp.2d 465, 471 (E.D.N.Y.2001) (" [D]ischarge under the Bankruptcy Code, presumes that all creditors bound by the plan have been given notice sufficient to satisfy due process. Inadequate notice is a defect which precludes discharge of a claim in bankruptcy.") (internal quotation marks and citations omitted); *In re Arch Wireless,* 332 B.R. 241, 251 (Bankr.D.Mass.2005) ("[I]f a creditor is not given adequate notice of the bar date for filing claims, the hearing on plan confirmation, or the order confirming a plan in a Chapter 11 case, the creditor may not be bound by the plan's provisions and its claim is not discharged.") (collecting numerous cases, including circuit court case law).

It is well-settled that a debtor who files for bankruptcy protection must give notice that is reasonably calculated under the totality of circumstances presented to apprise potential creditors of the pendency of the bankruptcy case. *See, e.g., In re Envirodyne Indus., Inc.,* 214 B.R. 338, 347-48 (N.D.Ill.1997) (citing, *inter alia, Mullane,* 339 U.S. at 314). Both precedent and the Bankruptcy Code reflect; that actual notice to every potential creditor is not required to satisfy the demands of the Bankruptcy Code or the

Constitution. In this regard, for example, publication notice (as opposed to actual notice) is sufficient for unknown creditors-at least assuming, as discussed below, that the publication notice is effected in a manner that is sufficiently clear and comprehensive. *See Fogel,* 221 F.3d at 962-63 (" Fair or adequate notice has two basic elements: content and delivery. If the notice is unclear, the fact that it was received will not make it adequate.") (collecting authorities). The law will not require actual notice to each and every potential creditor because, for example, it may not be practicable to identify all possible creditors, so as potentially even to be able to provide actual notice. In the instant context, the Federal Rules of Bankruptcy Procedure set forth the required manner of providing notice, as discussed further below. *See*Fed. R. Bankr.P. 1005, 2002(n); *see also*11 U.S.C. § 342. It is the debtor's burden to ensure that all creditors have been properly notified in accordance with these requirements. *See, e.g., In re Anderson,* 159 B.R. 830, 837 (Bankr.N.D.Ill.1993) ("The burden is on Debtor to insure that all creditors have been properly notified.") (citation omitted).

### A. ATC Has Not Demonstrated That Grand Pier Was An Unknown Creditor

An important threshold issue is whether Grand Pier was a "known" versus "unknown" creditor. In deciding what notice is necessary, courts usually divide creditors into "known" and "unknown" creditors. *See, e.g., Fogel,* 221 F.3d at 963. An " unknown" creditor "is a claimant whose identity or claim is wholly conjectural or whose interest or whereabouts could not with due diligence be ascertained by the debtor."*See In re J.A. Jones, Inc.,* 492 F.3d at 250 (collecting cases; internal quotation marks and footnote omitted); *accord, e.g., Solow Building,* 175 F.Supp.2d at 471 (collecting cases). Precedent teaches that a creditor is " ascertainable," for notice purposes, if that creditor can be discovered through "reasonably diligent efforts." *Mennonite Bd. of Missions v. Adams,* 462 U.S. 791, 798 n. 4, 103 S.Ct. 2706, 77 L.Ed.2d 180 (1983); *accord, e.g., Solow Building,* 175 F.Supp.2d at 471. Precedent teaches that " reasonable diligence," as one naturally would

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 6 of 14

Case 07-00384   Doc 18-1   Filed 11/14/07   Entered 11/14/07 16:32:50   Desc Brief
Part 2 In Support of Motion for Summary Judgment   Page 23 of 31

expect, does not require "impracticable and extended searches," *Mullane,* 339 U.S. at 317, and what is reasonable depends on the facts of each case. *Id.* at 314-15. Nonetheless, substantial federal appellate authority instructs that a debtor must engage in a meaningful search of its own books and records, and that claimants who are "reasonably ascertainable" through such a search are considered "known" creditors. *See, e.g., In re J.A. Jones, Inc.,* 492 F.3d at 250 (citing *Chemetron Corp.,* 72 F.3d at 346); *In re Crystal Oil Co.,* 158 F.3d 291, 297 (5th Cir.1998) (collecting appellate authority)).

**\*5** The distinction between an "unknown" and a "known" creditor is significant. For an unknown creditor, appropriate publication notice "can suffice." *Tulsa Professional Collections Servs., Inc. v. Pope,* 485 U.S. 478, 490, 108 S.Ct. 1340, 99 L.Ed.2d 565 (1988). In contrast, for a known or "reasonably ascertainable" creditor, means reasonably calculated to provide actual notice (such as notice by mail) are typically required. *Id.*

In this regard, the Court notes that precedent does not accept the sufficiency of publication notice for unknown creditors because of any irrational optimism-or even any particular confidence-about the likelihood that such publication will apprise a potential unknown creditor about the putative loss of a pre-petition property right against the debtor. To the contrary, Supreme Court precedent has long acknowledged that publication notice is, at most, a second-best approach. *See Tulsa,* 485 U.S. at 489 ("As the Court noted in *Mullane,* 'chance alone brings to the attention of even a local resident an advertisement in small type inserted in the back pages of a newspaper.'") (quoting *Mullane,* 339 U.S. at 315); *City of New York,* 344 U.S. at 296 ("Notice by publication is a poor and sometimes a hopeless substitute for actual service of notice. Its justification is difficult at best."). Nonetheless, our legal system and Bankruptcy Code reflect a broad consensus that the possibility of a fresh start under Chapter 11-including, of particular relevance for present purposes, a corporate reorganization under Chapter 11-is a positive thing. In addition, for any sophisticated or large-scale employer to effect a Chapter 11 reorganization, and thereby to preserve the going-concern economic value and jobs that

such reorganizations ideally provide for the economy as a whole, creditors, and the work force, a requirement of actual notice to all putative creditors is simply impracticable. *See generally, e.g., Mullane,* 339 U.S. at 317 ("This Court has not hesitated to approve of resort to publication as a customary substitute ... where it is not reasonably possible or practicable to give more adequate warning. Thus it has been recognized that, in the case of persons missing or unknown, employment of an indirect and even a probably futile means of notification [via publication] is all that the situation permits and creates no constitutional bar to a final decree foreclosing their rights."). As a result, publication notice, at least where competently and sensibly effected, can suffice.

The first reason summary judgment must be denied in this case is because ATC has not shown, through unrefuted and appropriately supported factual contentions, that Grand Pier was not a "known" or reasonably ascertainable creditor.[FN3] In support of its contention that publication was an adequate means of providing notice of its bankruptcy, ATC simply argues-without any appropriate evidentiary support, much less uncontroverted evidence-that Grand Pier was an unknown creditor because ATC "had never been notified prior to the filing of the bankruptcy petition that Plaintiffs asserted claims against it." (D.E. 75 at 9.) ATC claims in its brief to have first learned of the claim when the instant suit was filed in 2005. (*See id.;* D.E. 100 at 3.) However, as Grand Pier explains (*see* D.E. 96 at 10), ATC offers no actual evidence in its moving papers in support of its assertions that Grand Pier was an unknown creditor, and given that the burden of showing the propriety of summary judgment falls on the movant, ATC's unsworn assertions are inadequate.

> FN3. Such a creditor is typically owed a reasonable attempt at the provision of actual notice-at least, for example, where there is not a plethora of *de minimis* claims, such that the costs of attempting actual notice, like the cost of a postage stamp, might exceed the amount of the claim at issue. No one contends that an

Case 07-00384    Doc 18-1    Filed 11/14/07    Entered 11/14/07 16:32:50    Desc Brief
Part 2 In Support of Motion for Summary Judgment    Page 24 of 31

Page 7 of 14

Slip Copy

Page 6

Slip Copy, 2007 WL 2973829 (N.D.Ill.)
**(Cite as: Slip Copy)**

attempt at actual notice to Grand Pier was made here.

**\*6** Grand Pier points out that ATC's final Subsurface Report for Grand Pier was dated July 8, 1999, which was eighteen days before ATC filed its bankruptcy petition. (D.E. 96 at 12; D.E. 75 at 2; D.E. 97-2 ¶ 8.) Grand Pier argues from this that the information needed to notify Grand Pier of the bankruptcy therefore was "easily ascertainable." (D.E. 96 at 12.) With all respect, this contention is seemingly overstated: the completion of the July 8, 1999 Subsurface Report for Grand Pier does not demonstrate that Grand Pier was a known *creditor*, because there is no evidence that ATC knew that Grand Pier might have a claim based on this report. Nonetheless, the thorium contamination was discovered on February 29, 2000 (D.E. 101 ¶ 12), about one month before plan confirmation and some two months before ATC's bankruptcy plan became effective. (D.E. 97 ¶¶ 27-28.) The record is unclear as to whether ATC knew about the contamination or Grand Pier's potential claim during the pendency of its bankruptcy, but Grand Pier has introduced evidence that the discovery of the thorium was a substantial and well-publicized event in the Chicago commercial and news worlds. ( *See, e.g.,* D.E. 22 at 2 and exhibits discussed therein.).

To be sure, the fact that an event was well-publicized in leading Chicago newspapers does not conclusively prove that a debtor became aware of it, or prove that a debtor would reasonably appreciate that the discovery of substantial environmental contamination on a large commercial real estate development site would provide a reasonable basis to conclude that there was a non-conjectural claim against a debtor concerning that environmental discovery. The entire subject has been, with all respect, the subject of minimalist briefing in the summary judgment process, and the Court offers no conclusive assessments or even tentative speculations about such issues. Nonetheless, nothing has been adduced by ATC to eliminate the possibility that a factfinder could conclude that the discovery of serious environmental contamination at a large commercial real estate development would prompt a debtor to

appreciate that a party like Grand Pier would have a likely claim against an entity like "ATC Associates, Inc."-particularly given that ATC Associates, Inc., had been hired to investigate and report on such environmental issues. Again, the procedural posture of the case is important: ATC is seeking summary adjudication of Grand Pier's claim, and under the applicable summary judgment standards, ATC has not satisfied its burden on the issue of whether Grand Pier was an "unknown," as opposed to a " known" or "reasonably ascertainable," creditor.

Before concluding on this issue, the Court notes that ATC is certainly correct that debtors are not required to provide actual notice to everyone with whom they have previously done business. *See Environdyne,* 214 B.R. at 348 ("A debtor does not have the duty to search out each conceivable or possible creditor and urge that person or entity to make a claim against it.") (internal quotation marks and citations omitted); *accord In re U.S.H. Corp. of New York,* 223 B.R. 654, 659 (Bankr.S.D.N.Y.1998) ("Debtors cannot be required to provide actual notice to anyone who potentially could have been affected by their actions; such a requirement would completely vitiate the important goal of prompt and effectual administration and settlement of debtors' estates."). But ATC's "proving" of that truism is not dispositive of the issues at hand. The record here does not fairly allow any conclusion that Grand Pier was an "unknown creditor" under the standards prescribed by Fed.R.Civ.P. 56 and Local Rule 56.1. In addition, it is also undisputed that no attempt was made to give actual notice to Grand Pier. Under those circumstances, summary judgment in favor of ATC is inappropriate.

B. Even if Grand Pier Were Conclusively Shown to Be an "Unknown" Creditor, ATC Failed to Provide Appropriate Notice in Accordance with the Bankruptcy Rules

**\*7** Bankruptcy Rule 1005 states: "The caption of a petition commencing a case under the [Bankruptcy] Code shall contain ... the title of the case .... The title of the case shall include ... all other names used within six years before filing the petition."Fed. R. Bankr.P. 1005. In this regard, the Advisory

Slip Copy

Slip Copy, 2007 WL 2973829 (N.D.Ill.)
**(Cite as: Slip Copy)**

Committee Note specifically states that " [a]dditional names of the debtor are also required to appear in the caption of each notice to creditors." Fed. R. Bankr.P. 1005, Notes of the Advisory Committee [FN4]; *In re Friedman,* 184 B.R. 883, 888 (Bankr.N.D.N.Y.1994), *aff'd* 184 B.R. 890 (N.D.N.Y.1995). Moreover, Rule 2002(n) provides that "[t]he caption of every notice ... shall comply with Rule 1005."Fed. R. Bankr.P.2002(n). As caselaw acknowledges, "accuracy of the caption is of substantive importance in bankruptcy cases. It is the caption which informs creditors of exactly who has commenced a bankruptcy case so that the creditor has an opportunity to determine whether they have a claim against the debtor's estate."*In re AM Int'l, Inc.,* 142 B.R. 252, 256 (Bankr.N.D.Ill.1992) (internal quotation marks and citations omitted); *accord, e.g., In re Anderson,* 159 B.R. 830, 838 (Bankr.N.D.Ill.1993) (citation omitted). For this reason, the caption requirements of Rule 1005"are strictly enforced by bankruptcy courts."*In re AM Int'l,* 142 B.R. at 256.

> FN4. Precedent teaches that a court appropriately considers the Notes of the Advisory Committee on Bankruptcy Rules when interpreting those rules. *See In re Fesco Plastics Corp., Inc.,* 908 F.2d 240, 242-43 (7th Cir.1990) (citing, *inter alia, Mississippi Publishing Corp. v. Murphree,* 326 U.S. 438, 444, 66 S.Ct. 242; 90 L.Ed. 185 (1946)); *accord, e.g., Schiavone v. Fortune,* 477 U.S. 21, 31, 106 S.Ct. 2379, 91 L.Ed.2d 18 (1986) (citing *Murphree,* 326 U.S. at 444).

Precedent instructs that notice to creditors which fails to comply with the Bankruptcy Rules is insufficient to preclude post-bankruptcy claims by those creditors. *See In re Hanson,* 397 F.3d 482, 487 (7th Cir.2005) (stating that, "where the Bankruptcy Code and Bankruptcy Rules require a heightened degree of notice, due process entitles a party to receive such notice before an order binding the party will be afforded preclusive effect") (citation omitted); *In re Banks,* 299 F.3d 296, 302 (4th Cir., 2002) ("Where the Bankruptcy Code and Bankruptcy Rules specify the notice required prior

to entry of an order, due process generally entitles a party to receive the notice specified before an order binding the party will be afforded preclusive effect." ).[FN5] Because, as explained below, the publication notice in this case was inadequate as to an unknown creditor-as ATC unsuccessfully urged Grand Pier was for summary judgment purposes, but as the Court will now assume *arguendo* regarding Grand Pier for the analysis to follow-summary judgment is independently precluded on this basis.

> FN5. The Court notes that at least one court has cautioned that one should not understand any and every failure to abide by the requirements of the Bankruptcy Rules as constituting a constitutional due process violation. *See In re Arch Wireless,* 332 B.R. 241, 252 (Bankr.D.Mass.2005) (stating that; failure to comply with the Bankruptcy Rules "does not ... necessarily mean that constitutional standards for due process have been left unsatisfied .... [but][b]ecause the notice requirements under the Bankruptcy Rules are designed to provide procedurally adequate notice ... debtors disregard them at their peril.") (collecting cases). To be sure, one would be reluctant to suggest that any and every procedure set forth in the current version of the Bankruptcy Rules is constitutionally required, or to read caselaw like *In re Hanson, supra,* and *In re Banks, supra* (both cited immediately above in the text), to mandate than any and every minor rules violation by definition is an error of constitutional magnitude. *See, e.g., Sierra Resources, Inc. v. Herman,* 213 F.3d 989, 992 (7th Cir.2000) ("Sierra's argument seems to assume that for every statutory or regulatory violation of a procedural nature there must necessarily be a due process violation at a Constitutional level, a contention that is without any basis in the law.") (collecting numerous cases); *see also, e.g.,* Bankr.Rule 9005 (specifying that Fed.R.Civ.P. 61, concerning the treatment of harmless error, "applies in cases under the [Bankruptcy] Code.").

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Page 8

Slip Copy, 2007 WL 2973829 (N.D.Ill.)
**(Cite as: Slip Copy)**

Nonetheless, even if one assumes that some errors legitimately can be harmless with respect to the Bankruptcy Code (as they are with respect to the federal criminal and civil codes of procedure, for example), ATC does not advance any harmless error argument here. Moreover, the Court would be most reluctant to find error of the sort to have occurred here concerning the notice to be harmless. Under the record presented, if Grand Pier was an unknown creditor, it seemingly had no notice via the publication notices that its claim against "ATC Associates, Inc." ( *i.e.,* the only name provided by the entity it had ever done business with), was subject to an upcoming putative bar date via the bankruptcy proceedings ongoing in New York City. As explained elsewhere, the Supreme Court has been quite candid in recognizing that publication notice is of relatively limited utility in at least some instances. *See, e.g., City of New York v. New York, New Haven & Hartford R.R. Co.,* 344 U.S. 293, 296, 73 S.Ct. 299, 97 L.Ed. 333 (1953) ("Notice by publication is a poor and sometimes a hopeless substitute for actual service of notice. Its justification is difficult at best."). The law accepts the use of publication notice-for example, concerning unknown creditors-because otherwise there would be no way to effect corporate reorganizations and achieve the benefits they have been determined to offer. Nonetheless, ATC offers no authority to suggest that a publication notice as defective as the one employed here is sufficient to discharge a claim against an unknown creditor.

In the initial bankruptcy petition, ATC listed "ATC Associates, Inc." as one of the several names it had used in the last six years. (D.E. 97 ¶ 18.) However, ATC failed to list that name anywhere in any of the subsequent filings, including, most significantly for present purposes, in the caption or text of its publication notices. (D.E. 101 ¶¶ 1-3.) Therefore, ATC failed to comply with Rule 2002(n), which dictates that the caption of the notice sent to

creditors must comply with Rule 1005 by including "all other names used within six years before filing the petition."Fed. R. Bankr.P. 1005; *see also*Fed. R. Bankr.P. 1005, Notes of the Advisory Committee (specifying that "[a]dditional names of the debtor are also required to appear in the caption of each notice to creditors.").

**\*8** In attempting to escape the consequences of this defect, ATC argues that Grand Pier sued ATC Group Services, Inc., in this litigation, (D.E. 1 in Case No. 05 C 1156), so Grand Pier supposedly cannot claim that it had no reason to believe that " ATC Group Services, Inc." was related to "ATC Associates, Inc." (D.E. 100 at 5.) This argument is, with all respect, unpersuasive: the instant suit only demonstrates that Grand Pier knew of the existence of ATC Group Services, Inc., on February 25, 2005, the time it filed its first complaint. (D.E. 1 in Case No. 05 C 1156.)It does not establish that Grand Pier knew of ATC Group Services, Inc.'s affiliation with "ATC Associates, Inc.," at the time of the bankruptcy. To the contrary, the evidence in the record, when evaluated under applicable Local Rule 56.1 standards, reflects that the invoices Grand Pier received for the relevant environmental assessment services referred only to "ATC Associates, Inc." as the vendor, and that Grand Pier had no reason to believe that "ATC Associates, Inc." was affiliated with "ATC Group Services, Inc." (D.E. 101 ¶¶ 6-9; D.E. 97 SAF 11 6-9.)

In a similar case from the bankruptcy court in this district, a creditor named Wella Corporation purchased a manufacturing facility from a debtor then known as the Addressograph-Multigraph Corporation. *In re AM Int'l, Inc.,* 142 B.R. at 253. That debtor subsequently changed its name to AM International, Inc. ("AMI"). *Id.*AMI filed for bankruptcy three years later, and published its notice of bar date in the Wall Street Journal with the caption: "AM International, Inc, a Delaware Corporation, Debtor."*Id.* After the bankruptcy process was completed, Wella discovered hazardous waste at the site it had purchased from the debtor under its original name, the Addressograph-Multigraph Corporation, and sued. *Id.* at 254.The bankruptcy court, proceeding on the assumption that Wella was an unknown creditor,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 10 of 14

Case 07-00384   Doc 18-1   Filed 11/14/07   Entered 11/14/07 16:32:50   Desc Brief
Part 2 In Support of Motion for Summary Judgment   Page 27 of 31

held that because the caption of the publication notice failed to include other names used by AMI within six years before filing the petition-which was required by then-Interim Bankruptcy Rules 1005 and 2002(c)-notice was defective and Wella's claim had not been discharged. *Id.* at 255-57.The same result follows from the facts of this case.

ATC makes a series of arguments as to why its publication notice was sufficient, but none of these arguments persuades the Court to depart from the holding of *AM International.*In this regard, ATC first argues that it complied with Rule 1005 because the petition commencing the bankruptcy included ATC Associates, Inc., in the caption. (D.E. 100 at 6.) However, this does not mean that ATC complied with Rule 2002(n), which requires that the captions of notices (and not just the intial petition) comply with Rule 1005 by listing names used in the last six years. *Accord*Fed. R. Bankr.P. 1005, Notes of the Advisory Committee (specifying that, "[a]dditional names of the debtor are also required to appear in the caption of each notice to creditors."). The bankruptcy petition could not have provided Grand Pier with notice unless Grand Pier had been searching through bankruptcy court filings [FN6] looking for debtors it might have claims against. Although the possibility that Grand Pier would have run across the name of ATC Associates, Inc., in the newspaper is also somewhat improbable, *see, e.g., Mullane,* 339 U.S. at 315, publication notice is the established method of satisfying due process considerations when providing notice to unknown creditors. *See City of New York,* 344 U.S. at 296. Put differently, while publication notice sometimes may provide a reasonably poor chance that an unknown creditor will receive actual notice that its property rights may be extinguished in ongoing bankruptcy proceedings-*see, e.g., id.*-that unknown creditor is at least entitled to get a meaningful shot at learning of the bankruptcy proceedings through a publication notice that meaningfully identifies the entity with which it dealt. ATC failed to comply with the Bankruptcy Rules in providing publication notice, and its simple compliance with Rule 1005 in filing the intial petition does not absolve it from this failure.

FN6. The bankruptcy filings at issue were made in a different place (indeed, in a different time zone) than the location of relevant real estate site and the environmental assessment work performed on it. In this case, the two locations involved were major metropolitan cities (New York and Chicago, respectively), but it is not even clear that this factor helps ATC. There are more, not less, corporate bankruptcies filed in a place like New York City than in rural judicial districts, and thus the putative burden on an unknown creditor like Grand Pier under the search-duty regime ATC proposes would be, if anything, greater and not less. Moreover, to the extent ATC's theory is adopted, one presumably would need to accept the proposition that Grand Pier could have learned of the bankruptcy affecting "ATC Associates, Inc.," which was listed only on the initial bankruptcy filing as a recent d/b/a for "ATC Group Services, Inc.," regardless of where the initial filing was made. If that is correct, then the search burden on an unknown creditor like Grand Pier expands to a nation's worth of corporate bankruptcy petitions. That rule hardly seems sensible particularly given that a readily available alternative-*i.e.,* having the corporate debtor simply include its recent d/b/a names in its notices to creditors-is (1) prescribed by Bankruptcy Rules and Notes of the Advisory Committee; and (2) places the burden concerning d/b/a/ notices on the party (*i.e.,* the reorganizing corporate petitioner) who has the most readily available information on the subject. Finally, in this regard, the Court notes that bankruptcy law generally is reluctant to impose search costs on a putative creditor; thus, for a known creditor, the debtor is not relieved of the consequences of a failure to attempt actual notice, even if that known creditor comes through other means to receive *actual knowledge* of ongoing bankruptcy proceedings that might affect the known creditor's rights. *See, e.g.,*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 07-00384   Doc 18-1   Filed 11/14/07   Entered 11/14/07 16:32:50   Desc Brief
Part 2 In Support of Motion for Summary Judgment   Page 28 of 31

Page 11 of 14

Slip Copy

Page 10

Slip Copy, 2007 WL 2973829 (N.D.Ill.)
**(Cite as: Slip Copy)**

*Reliable Electric Co. v. Olson Construction Co.,* 726 F.2d 620, 622 (10th Cir.1984) ("As specifically applied to bankruptcy reorganization proceedings, the [Supreme] Court has held that a creditor, who has general knowledge of a debtor's reorganization proceeding, has no duty to inquire about further court action. The creditor has the right to assume that he will receive all of the notices required by statute before his claim is forever barred.") (collecting cases, including *New York v. New York, New Haven & Hartford R.R. Co.,* 344, 293, 297 (1953); internal quotation marks omitted); *In re Harbor Tank Storage Co.,* 385 F.2d 111, 115 (3rd Cir.1967); *In re Arch Wireless,* 332 B.R. 241, 252-53 (Bankr.D.Mass.2005). To be sure, a careful reading of cases like *Reliable* reveals that the cases were speaking in the context of known creditors who failed to receive formal notice, and the Court does not believe that *Reliable* and related cases themselves command the outcome reached here. Nonetheless, it would be anomalous to adopt ATC's argument that Grand Pier, a putatively unknown creditor, in the wake of a defective public notice, should have been required to search court files to find a bankruptcy petition, which alone revealed that "ATC Associates, Inc." was a d/b/a name used by the Reorganizing Debtors within the last six years, given that it is settled that a known creditor who receives *actual knowledge* of bankruptcy proceedings has no duty to inquire or file a claim unless actual notice is afforded in conformity with the Bankruptcy Rules.

*9 ATC also argues that the name ATC Associates, Inc., "is substantially similar to the names of the other ATC entities listed in the caption such that a reasonable person would have made the connection ."(D.E. 100 at 5.) ATC is referring to bankruptcy filings that included the names ATC Group Services, Inc., ATC New England Corp., ATC InSys Technology, Inc., ATC Environmental, Inc., and ATC Construction Services, Inc. (D.E. 75-8;

D.E. 75-19.) However, the similarity of the names does not excuse ATC's failure to comply with the caption requirements. *See In the Matter of Sleepy Giant, Inc.,* 120 B.R. 6, 7-8 (Bankr.D.Conn.1990) (where debtor named "Sleepy Giant, Inc." failed to include its previous name, "Original Sleepy Giant, Inc." on its notice, creditor was excused for not filing proof of claim before the bar date); *In re Gamble,* 85 B.R. 150, 151 (Bankr.N.D.Ala.1988) (where notice of Chapter 13 bankruptcy listed debtor as "Eula Kyle Gamble," creditor did not receive adequate notice of debt under the name " Eula M. Kyle"). Since the burden is on ATC to provide the correct notice, and the Bankruptcy Rules in this regard are strictly enforced, the similarly of the names does not make notice adequate. *See AM Int'l,* 142 B.R. at 256 (stating, in a case involving a putative unknown creditor, that " the adoption of a 'should have known' standard of knowledge to determine adequacy of notice would redistribute the duties of the creditor and debtor set by the Supreme Court in [*City of New York* ]."); *see also id.* at 257 ("Adopting a 'should have known' standard would excuse noncompliance with the Bankruptcy Rules and burden Wella [the unknown creditor] with making the connection between AM International, Inc. and Addressograph-Multigraph Corporation when ... [the Bankruptcy Rules] ... have already placed that duty on AMI.").

Before moving on, it is worth pausing to note that ATC's proposed "creditor's duty to inquire" regime for unknown creditors is-in addition to being, at least in this Court's opinion, inconsistent with the Bankruptcy Rule's prescribed notice system-not particularly practical either when evaluated against contemporary legal practice. Corporate reorganizations of course come in different shapes and sizes. However, many of the most important ones involve very large corporate entities, with dozens or perhaps even hundreds of affiliated corporations and entities also filing for reorganization. In such settings, it is commonplace for a large corporation to place some, but not all, of its subsidiaries or affiliated entities into the consolidated reorganization. The decision whether to place any given entity into the reorganization is the subject of thoughtful analysis by both businesspersons and their legal counsel. Two

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Page 11

Slip Copy, 2007 WL 2973829 (N.D.Ill.)
**(Cite as: Slip Copy)**

subsidiaries might be analogous in many respects, but one will be withheld from the reorganization because it is, for example, meaningfully involved in government contracting work (where a bankrupt entity may be precluded from competing, for example, for public works projects), or because the entity is heavily involved in foreign commerce, where the perception of a corporate reorganization may be more negative than it generally is domestically. At times, the hope of withholding a particular corporate entity from the reorganization for such reasons cannot be realized; for example, if it has provided certain loan guarantees for entities that must be reorganized. The bottom line, however, is that if an unknown creditor heard generically that "ACME International Co." were going into a Chapter 11 reorganization, that would not be a reliable signal to expect that "ACME International Services Co.," or "ACME International Widgets Co.," or "ACME International Co. (Canada)," or " ACME International Government Contracting Co." were part of the reorganization. As a result, the " creditor's duty to inquire" regime that ATC proposes would create a scenario where a multiplicity of putative unknown creditors, who might generically get some wind of a reorganization, would have to search to see if that reorganization might potentially bar a claim against one or more affiliated entities or subsidiaries. That scenario, replete with wasted effort and the likelihood of substantial adjudication costs (as parties inevitably would disagree about what constituted sufficient, but imperfect, publication or other notice so as to trigger the creditor's duty to inquire), is hardly an appealing one from a systemic perspective. Moreover, it is not appealing from a practical perspective, particularly when one considers that some unknown creditors, perhaps most, are likely to be small businesses that typically are not experienced or adept at navigating through bankruptcy court files in other parts of the country.

**\*10** Next, ATC argues that the bankruptcy court's order of July 26, 1999, which directed joint administration of the eight pending Chapter 11 cases, "solely for procedural purposes," provided for a joint caption identifying the group of debtors as "ATC Group Services, Inc." (D.E. 75-6 at 2; *see also* D.E. 100 at 7.) ATC appears to be arguing that

through its orders, the bankruptcy court sanctioned the caption used for publication notice pursuant to Rule 2002(m), which states that "[t]he court may from time to time enter orders designating the matters in respect to which, the entity to whom, and the form and manner in which notices shall be sent except as otherwise provided by these rules."Fed. R. Bankr.P.2002(m). However, the caveat "except as otherwise provided by these rules" indicates that the caption requirements of Rule 1005 and Rule 2002(n) cannot be overridden by a judicial order. Even if the Orders upon which ATC relies can be read as approving of the Notice of Publication, (D.E. 75-7 at 5; D.E. 75-15 at 11), the bankruptcy court's order cannot supercede the requirements of the Bankruptcy Rules. *See also, e.g., In re Hanson,* 397 F.3d at 487 (discussing due process concerns embodied in compliance with the Bankruptcy Rules); *In re Banks,* 299 F.3d at 302 (same).[FN7]

FN7. As previously acknowledged, *see* note 5, *supra,* one might argue that language in cases like *In re Banks,* 299 F.3d 296 (4th Cir.2002)-which might be read to suggest that a violation of a Bankruptcy Rule notice rule itself generally constitutes a constitutional due process violation, *see id.* at 302 ("Where the Bankruptcy Code and Bankruptcy Rules specify the notice required prior to the entry of an order, due process generally entitles a party to receive the notice specified before an order binding the party will be afforded preclusive relief.")-should not be read too literally, given that a violation of a single statutory provision is not normally understood to entail a due process violation of constitutional magnitude. Such a concern, however, does not affect the result here. Even if one made a more typical fact-sensitive assessment of due process concerns familiar to courts for decades under *Mullane v. Central Hanover Bank and Trust,* 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950), the facts in this case (at least as they must be understood for summary judgment purposes), reflect that: (1) Grand Pier had no basis to suspect

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 07-00384    Doc 18-1    Filed 11/14/07    Entered 11/14/07 16:32:50    Desc Brief
Part 2 In Support of Motion for Summary Judgment    Page 30 of 31

Page 13 of 14

Slip Copy

Page 12

Slip Copy, 2007 WL 2973829 (N.D.Ill.)
**(Cite as: Slip Copy)**

or be on notice that the relevant debtors were going through a reorganization under Chapter 11 that might affect their environmental claim; and (2) the debtors provided no meaningful way for Grand Pier to know of their bankruptcy-including, in particular, in the generic publication notice that precedent teaches is often a second-best means of giving notice anyhow.

Finally, ATC relies on Bankruptcy Rule 1015, which authorized the administrative consolidation of the bankruptcy, and which permits bankruptcy courts to "enter orders as may tend to avoid unnecessary costs and delay."Fed. R. Bankr.P. 1015(c).[FN8] ATC argues that if names of all debtors as well as their d/b/a names had to be listed in the publication notice, "costs would have been prohibitive and would have reduced the amount available for creditors."(D.E. 100 at 8.) It is true that in many instances, a court may take into account the costs that would be incurred in determining how a bankruptcy should proceed. *See, e.g., In re PL Liquidation Corp.,* 305 B.R. 629, 632 (Bankr.D.Del.2004) (stating that joint administration of bankruptcy proceedings under Fed. R. Bankr.P. 1015"is meant to aid the Court in expediting proceedings and to make the cases less costly") (citation omitted); *see also Fogel,* 221 F.3d at 963 (stating that in deciding whether notice by publication is appropriate, the Court may consider the cost of providing direct notice relative to the amount available for creditors). But ATC offers no support for the contention that the cost of publishing the additional d/b/a names of the corporate debtors can outweigh a debtor's duty to comply with the Bankruptcy Rules and due process requirements vis-a-vis creditors who stand to have property claims extinguished. Instead, Rules 1005 and 2002(n) and the relevant Notes of the Advisory Committee reflect a judgment that the inclusion of previous d/b/a names on the notices is worth the minimal extra publication cost. Moreover, even if one assumed *arguendo* that there might be some case-sensitive flexibility in the analysis for an exception to the publication requirements (notwithstanding that the Bankruptcy Rules and relevant portions of the Notes of the Advisory

Committee do not readily seem to provide such flexibility), there has been no showing that possibly would justify summary judgment in ATC's favor on that basis.

> FN8. The debtors' estates in this case were consolidated only for administrative purposes, which is a garden-variety step taken in most, if not virtually all, cases involving corporate reorganizations and multiple related debtors, An " administrative consolidation" in the bankruptcy context is very different from a "substantive consolidation" of the related debtors. In the context of a typical substantive consolidation, the corporate forms of the entities involved are disregarded, assets are pooled into a single pot, and all claims against the debtors proceed against that pot of assets. *See In re Augie/Restivo Baking Co.,* Ltd., 860 F.2d 515, 518 (2d Cir.1988) (Winter, J.); *accord, e.g., In re The Babcock and Wilcox Co.,* 250 F.3d 955, 958 n. 5 (5th Cir.2001). An "administrative consolidation" is "merely a procedural device used to deal efficiently with multiple estates," and as the name implies, is not supposed to "affect [ ] the substantive rights of the parties."*Id.,* 250 F.3d at 958 n. 6 (citation omitted).

**\*11** In that regard, to the extent the record reflects information relevant to a hypothetically-available fact-sensitive, practical analysis about whether it is financially prudent to spend money on including notice of the d/b/a names, the record reflects that this was a *substantial* corporate reorganization, involving substantial amounts of economic assets and creditor claims. In this regard, the Court notes that the approved attorney and professional fees in the case appear to have exceeded $3.5 million alone. (*See* D.E. 75-24 at 2.) The Court takes no quarrel with that figure, which was subject to disclosure and independent review and approval by the bankruptcy judge. Nonetheless, the approved fees figure does suggest that this is not a case where one could reasonably conclude that the estate could

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Page 13

Slip Copy, 2007 WL 2973829 (N.D.Ill.)
**(Cite as: Slip Copy)**

not sensibly incur the relatively minimal cost of publishing an additional 25 lines of type in a bar-date disclosure to unknown creditors. In addition, given that the case is at the summary judgment stage, no such showing has conclusively been made, which is what would be required in any event, assuming *arguendo* that such an exception can even be made to the publication disclosure regime prescribed by the Bankruptcy Code and relevant Notes of the Advisory Committee.

Before concluding, the Court addresses two final points. First, in its response brief, Grand Pier argued at some length, in a preemptive fashion, as to why any argument by ATC predicated on a since-superseded version of 11 U.S.C. § 342(c) would be unavailing. (*See* D.E. 96 at 7-9.) ATC had not raised such an argument in its opening brief, and it did not attempt to introduce such an argument in its subsequent briefing. As a result, the Court considers any argument under prior versions of 11 U.S.C. § 342(c) to have been waived; accordingly, the Court will not attempt to speculate about or address an unraised issue. Second, the Court notes that neither party suggests that the only remedy available to Grand Pier should be a late-filed claim against the since reorganized former debtor/former bankruptcy estate, as opposed to this orthodox lawsuit against the reorganized entity. Such an argument would appear to be inconsistent with federal appellate precedent-see *Reliable Electric Co. v. Olson Construction Co.,* 726 F.2d 620, 623 (10th Cir.1984) (rejecting such an argument)-and, as explained, it was not made in any event. Accordingly, this issue too is waived.

For all of the reasons explained above, ATC's motion for summary judgment is respectfully denied. The record does not reliably command the factual conclusion that Grand Pier was an " unknown creditor" within the meaning of bankruptcy law, and if Grand Pier was a "known creditor," there is no dispute that notice was inadequate. In addition, and independently, even if Grand Pier could reliably be determined to have been an "unknown creditor," the publication notice that was given was inadequate under the Bankruptcy Rules. Accordingly, summary judgment against Grand Pier is inappropriate.

## CONCLUSION

**\*12** For the reasons stated above, Defendant's motion for summary judgment (D.E.73) is respectfully denied. Defendant's motion for imposition of sanctions, *a fortiori,* is denied as well.

N.D.Ill.,2007.
Grand Pier Center LLC v. ATC Group Services, Inc.
Slip Copy, 2007 WL 2973829 (N.D.Ill.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.