may be done only by the route provided for collateral attacks on judgments. After the time for appeal had run, the validity of the sale was established, even against nonparties to the sale." In re Met-L-Wood Corp., 861 F.2d at 1018. The court subsequently found that since more than a year had passed since the sale order was entered, the Trustee's suit was properly dismissed. The Court noted that although "the result may seem a harsh one … [u]nless bankruptcy sales are final when made, rather than being subject to being ripped open years later, high prices will not be offered for the assets of bankrupt firms…." Id. at 1019.

Levi next contends that federal circuits are split with respect to the effect of lack of notice on personal property in a bankruptcy case. While that may be of note from an academic perspective, it is of no consequence where, as here, the Seventh Circuit provides controlling authority.

Levi's collateral attack on the Sale Order closely resembles In re Edwards, 962 F.2d 641 (7th Cir. 1992), in which a junior lienholder who was not afforded notice of a sale order initiated an adversary complaint seeking a determination that its interest had priority to those of the purchaser at the bankruptcy sale. Id. at 642. Stillman Valley National Bank ("Stillman") had a first mortgage on certain property owned by the debtor, while Golden Guernsey Dairy ("Guernsey") held a second mortgage. Id. The court eventually confirmed a sale of the property, with all liens against the property becoming liens against the proceeds. Stillman was fully paid, and a balance of $7,000 remained. Guernsey allegedly did not learn about the sale until it received a check from the trustee more than a year after the sale. Id. Apparently, in listing his creditors in his petition, the Debtor had given an incorrect address for Guernsey's lawyer. As a result, Guernsey failed to receive notice of the sale. Id.

6

Guernsey filed a motion to vacate the sale order. Id. at 643. The court noted that since the time to appeal had passed, "the sale could be challenged, if at all, only in accordance with the provisions of Rule 60(b) of the Federal Rules of Civil Procedure." Id. The court found that, pursuant to Rule 60(b), the time to vacate the sale order had passed, and declined to find that the inadequate notice given to Guernsey rendered the sale void and not subject to the one-year time limit set forth in Rule 60(b). The court declined to vacate the sale order. In doing so, the court considered the competing interests involved, stating "[t]o take away a person's property--and a lien is property--without compensation or even notice is pretty shocking, but we have property rights on both sides of the equation here…." Id. at 645. The court further found that the policy of finality of a bankruptcy sale was an important policy that "would mean rather little if years after the sale a secured creditor could undo it by showing that through some slip-up he hadn't got notice of it." Id. It is this policy of finality, and controlling procedural rules in place to ensure finality of approved sales and distributions, that Levi would have the Court ignore.

Levi asserts, in reliance solely upon secondary materials, that Hilco's status as a "bona fide seller" offers no protection where a lienholder was without notice of sale. See Motion at p. 11 (citing to COLLIER ON BANKRUPTCY ¶ 363.13). Levi's reliance is misplaced as he misstates Hilco's role in the transaction, and further ignores controlling authority. Hilco was neither the purchaser nor seller at the sale of debtor's assets. Rather, Hilco stood as agent to the debtor in possession lender, with a first priority perfected security interest securing a debt well exceeding the purchase price of the property that was the subject of the sale.

Moreover, Levi relies upon secondary material explicitly rejected by controlling authority. Judge Posner, in In re Edwards, acknowledged COLLIER ON BANKRUPTCY ¶ 363.13, and in rejecting reliance upon it, wrote that "the treatise makes no effort to reconcile this

7

statement with the policy of finality, and its main strut is a decision of the Supreme Court that long antedates section 363(m) and Rule 60(b)." Id. at 645. In denying the collateral attack, the court held that:

> The issue is what happens when the trustee or debtor in possession fails to make the required notice. That issue is controlled by the policy of finality illustrated by section 363(m) and by the limited scope of Rule 60(b). The doctrine of bona fide purchasers does not violate the due process clause.

Id. at 645 (7th Cir. 1992).

Again ignoring controlling authority, Levi instead relies principally upon Grand Pier Center, LLC v. ATC Serv., Inc., No. 03C 7767, 05 C 1156, 2007 WL 2973829 (N.D. Ill. Oct. 9, 2007), which, he contends, represents a "very similar case." Mot. at p. 9. Not so. Grand Pier dealt only with whether a creditor's claim was discharged as against a debtor that failed to provide sufficient notice. In contrast, Levi's claim is plainly untimely, and it seeks relief not from a debtor whose own conduct created any notice deficiencies, but from the recipient of sale proceeds who is not alleged to have acted in bad faith. Grand Pier is wholly inapposite to the question of the impact of the lack of notice, an issue "controlled by the policy of finality illustrated by section 363(m) and by the limited scope of Rule 60(b)." In re Edwards, 962 F.2d at 645.

In re Edwards further controls over Levi's reliance on non-binding authority for the proposition that a creditor without notice may either void the sale or "merely attach its lien to the proceeds in its regular turn." See Motion, at p. 12.; see also In re Edwards, 962 F.2d at 645 (distinguishing In re Fernwood, 73 B.R. 616 (Bankr. E.D. Pa. 1987), insofar as the "policy of finality illustrated by section 363(m) and by the limited scope of Rule 60(b)" essentially trumped the lienholder's claimed rights). Where, as here, the time for an appeal of a final sale order had passed, "the sale could be challenged, if at all, only in accordance with the provision of Rule

8

60(b)" In re Edwards, 962 F.2d at 643 (noting further that cases allowing rescission of sales frequently omit that "a motion to rescind the sale is untimely after the judgment in the district court has become final, save as allowed by Rule 60(b)").

### B. Hilco's Security Interest in the Proceeds of the Sale Has Priority Over Levi's Tax Lien

Even to the extent that Levi's collateral attack upon the Sale Order and pursuit of the proceeds of the sale could be deemed proper, Levi's relief is still unwarranted because: (1) Hilco's first priority, perfected security interest in the Debtor's property and the proceeds therefrom takes priority over Levi's tax claim, which did not become due and owing until after entry of the Final Financing Order; and (2) the indebtedness to Hilco, totaling, as of the Closing Date of the Sale, approximately $12,500,000, plus accrued and unpaid interest, fees, expenses and reasonable attorneys' fees, was not satisfied from the proceeds of sale, rendering moot any possibility of the satisfaction of Levi's junior lien claim.

#### 1. Levi's Tax Lien Does Not Have Priority Over Hilco's Security Interest

On June 9, 2004, the Court entered a Final Financing Order, granting Hilco, as agent for the DIP Lenders, a first priority, perfected security interest in and lien, under section 364(d)(1) of the Bankruptcy Code, upon all Secured Collateral[2] subject only to Permitted Priority Liens. See June 9, 2004 Financing Order ¶ 11(b), Dkt. # 121. The Post-Petition Loan Agreement defines "Permitted Priority Lien" as "any valid, perfected non-avoidable Permitted Lien existing on the

---

[2] The Final Financing Order defines "Secured Collateral" as "all pre-petition and post-petition property of the Debtors … whether now existing or hereafter acquired, that is subject to valid, perfected and non-avoidable Liens in existence immediately prior to the Filing Date or to valid and non-avoidable Liens in existence immediately prior to the Filing Date that are perfected subsequent to the Filing Date as permitted by Section 546(b) of the Bankruptcy Code…." Id. at ¶ b(iii)

9

Filing Date; provided, however, that the term 'Permitted Priority Lien' shall not include the Liens described in clauses (i), (iii), (vi) and (vii) (other than Liens on the Mexican M&E granted to the Pre-Petition Term Lender prior to the Filing Date) of the definition of the term 'Permitted Liens.'" (Post-Petition Loan Agreement, pp. 17-18, Dkt. # 121. and Ex. A to May 12, 2004 Interim Financing Order, Dkt. # 75.).

Clause (i) of the Post-Petition Loan Agreement's further defines a "Permitted Liens" provides as: "(i) Liens for taxes, assessments and other governmental charges or levies or the claims or demands of landlords, carriers, warehousemen, mechanics, laborers, materialmen and other like Persons arising by operation of law in the ordinary course of business for sums which are not yet due and payable[.]" (Id.) (emphasis added). Further, liens for taxes, assessments and other governmental charges or levies arising by operation of law in the ordinary course of business for sums that were due and payable after the Final Financing Order was entered on June 9, 2004 are not Permitted Priority Liens. (Id.)

In sum, the Post-Petition Loan Agreement, as approved by the Court, gave Hilco a first priority, perfected security interest in and lien upon collateral superior to liens for taxes, assessments and other governmental charges or levies arising by operation of law in the ordinary course of business for sums that became due and payable after the Final Financing Order was entered on June 9, 2004. (Id.)

By Levi's own admission, the 2004 tangible business personal property taxes from which the tax lien arises were not due and owing as of the entry of the June 9, 2004 Final Financing Order. See 2004 tax bill to Harper Wyman Co., attached as Exhibit 2 to the Affidavit of Carl E. Levi (evidencing an October 1, 2004 due date for taxes assessed by Carl Levi upon Harper Wyman Co.) Therefore, 2004 tangible business personal property taxes owed to Plaintiff are not

10

Permitted Priority Liens. (Affidavit of Carl E. Levi, 2004 tax bill to Harper Wyman Co., attached to Levi Affidavit as Exhibit 2 thereto; Post-Petition Loan Agreement, pp. 17-18, Dkt. # 75.)

    2.    **<u>As the Debt Secured by Hilco's First Priority, Perfected Security Interest Was Not Satisfied, No Proceeds from the Sale Would Have Been Available to Satisfy Levi's Junior Interest Arising from the Tax Lien</u>**

Levi does not dispute, nor can he, that the proceeds of sale failed to satisfy the indebtedness owed Hilco secured by a first priority, perfected security interest. <u>See</u> August 12, 2004 Automatic Stay Motion, Dkt. # 187, ¶ 18 (identifying the purchase price of debtors assets in amount exceeding $7,500,000); August 12, 2004 Automatic Stay Motion, Dkt. # 187, ¶ 21 (identifying post-petition obligations which exceeded the purchase price by an amount in excess of $5,500,000). Insofar as the Court determines that Hilco's first priority, perfected security interest had priority over Levi's junior tax lien, Levi's attempt to reach the proceeds of the sale is moot, as no remaining funds were available to satisfy junior lienholders.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, Defendant Hilco Capital, LP respectfully requests that the Court deny Plaintiff Carl E. Levi's Motion for Summary Judgment.

    Respectfully submitted,

    HILCO CAPITAL, LP

    By:  s/ Michael M. Eidelman
          One of Its Attorneys

Randall M. Lending, Esq.
Michael M. Eidelman, Esq.
Jeffery M. Heftman, Esq.
Vedder Price P.C.
222 North LaSalle Street
Suite 2600
Chicago, IL  60601-1003
Telephone: (312) 609-7500
Facsimile:  (312) 609-5005

Dated: February 1, 2008

12

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the foregoing **Defendant Hilco Capital, LP's Response to Plaintiff Carl E. Levi's Motion for Summary Judgment** was served on:

> Lewis J. Todhunter
> Defrees & Fiske
> 200 S. Michigan Avenue
> Chicago, IL 60604
> ljt@defrees.com

by electronic means on February 1, 2008.

/s/ Michael M. Eidelman